1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE, a non-
profit corporation,

      Plaintiff,

   v.

CALIFORNIA AMMONIA COMPANY
d/b/a CALAMCO, a non-profit
corporation,

      Defendant.

NO. CIV. S-05-0952 WBS JMF

ORDER RE: DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT;
PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

----oo0oo----

Plaintiff California Sportfishing Protection Alliance ("CSPA") filed this action against defendant California Ammonia Company d/b/a Calamco ("Calamco") alleging four causes of action under the Federal Water Pollution Control Act, commonly known as the Clean Water Act, 33 U.S.C. §§ 1251 et seq. ("CWA" or "Act"). Currently before the court are defendant's motion for partial summary judgment on the first and fourth causes of action, or in the alternative summary adjudication, and plaintiff's motion for summary judgment with respect to the second and third causes of

1

1 action.  The court will deny both motions for reasons set forth
2 in this order.

3 I.   <u>Factual and Procedural Background</u>

4        Plaintiff CSPA is a non-profit public benefit
5 corporation organized under the laws of the State of California.
6 (Compl. ¶ 8.)  Plaintiff's mission is to protect the wildlife and
7 natural resources of the waters of California.  (<u>Id.</u>)
8 Plaintiff's members reside in the Sacramento-San Joaquin Delta
9 ("Delta") and San Francisco Bay area and use and enjoy the Delta
10 for recreational and other activities.  (<u>Id.</u> ¶ 9.)

11        Defendant Calamco is a non-profit corporation that
12 operates a facility on twenty-two acres of land leased from the
13 Port of Stockton in Stockton, California.  (Pl.'s Statement of
14 Disputed and Undisputed Facts # 1.)  Defendant's facility is
15 located in the Port's East Complex, a parcel consisting of some
16 640 acres.  (<u>Id.</u>)  Defendant primarily receives and stores
17 ammonia products prior to distribution to its cooperative
18 members.  (<u>Id.</u> # 2).  These products include anhydrous ammonia
19 and urea ammonium nitrate (UN-32).  (<u>Id.</u>)

20        Congress enacted the CWA in 1972.  The CWA's stated
21 objective is "to restore and maintain the chemical, physical, and
22 biological integrity of the Nation's waters." 33 U.S.C. §
23 1251(a).  Congress created the National Pollutant Discharge
24 Elimination System ("NPDES") permit program as part of the CWA
25 and thereby authorized the Environmental Protection Agency ("EPA"
26 or "Agency") and state agencies with approved water quality
27 programs to "regulate[] point sources of pollution that reach the
28 waters of the United States."  33 U.S.C. § 1342(a)-(b); <u>County</u>

1  Sanitation Dist. No. 2 v. County of Kern, 127 Cal. App. 4th 1544,

2  1562 n.18 (2005).  "[O]n May 14, 1973, California became the

3  first state to be approved by the EPA to administer the NPDES

4  permit program."  County of Kern, 127 Cal. App. 4th at 1565-66;

5  39 Fed. Reg. 26061 (July 16, 1974).

6      In 1996, defendant applied for and received a NPDES

7  permit, NPDES Permit No. CA0083968, in connection with its use of

8  water from the San Joaquin River to warm ammonia as it is being

9  processed.  (Pl.'s Statement of Disputed and Undisputed Facts #

10  3.)  Defendant's NPDES permit was terminated as of October 27,

11  2006, when defendant discontinued the use of river water to warm

12  ammonia.  Cal. Reg'l Water Control Bd. Order No. R5-2006 (Central

13  Valley Reg'l Oct. 27, 2006).

14      Defendant's NPDES permit authorized it to discharge

15  contaminants in storm water as long as defendant met several

16  requirements.  One, defendant must have implemented Best

17  Available Technology ("BAT") and Best Conventional Pollutant

18  Control Technology ("BCT") to reduce or eliminate industrial

19  storm water pollution.  (NPDES permit ¶ 28.)  Two, defendant must

20  have developed and administered its Storm Water Pollution

21  Prevention Program ("SWPPP") in accordance with the requirements

22  of Attachment C to the permit.  (Id. ¶ 19.)  Three, defendant

23  must have not discharged materials other than storm water, which

24  were not otherwise authorized by the permit, into surface water

25  or surface water drainage courses.  (Id. (A)(3).)  Four,

26  defendant must have not caused certain listed conditions in the

27  receiving water.  (Id. (C)(1)-(13).)  Five, defendant must have

28  complied with the Monitoring and Reporting Program ("MRP")

3

1  attached to its permit.  (Id. Monitoring and Reporting Program
2  No. 96-201.)

3          Defendant captures some of the storm water that falls
4  onto its facility for reuse in its industrial processes.  (Pl.'s
5  Statement of Disputed and Undisputed Facts # 6.)  The rest of the
6  water flows into the Port's Municipal Separate Storm Sewer System
7  ("MS4").  (Morris Decl. Ex. I 59:1-12.)  Defendant's storm water
8  runoff enters the Port's East Complex storm water retention basin
9  through a series of culverts and ditches that serve other tenants
10 of the Port's East Complex and are a part of the MS4.  (Pl.'s
11 Statement of Disputed and Undisputed Facts # 8.)  This man-made
12 basin ("detention pond"), which is approximately 12.75 acres in
13 area, was added in 1998 as a structural control device.[1]  (Id. #
14 12).  Storm water remains in this basin for some period of time
15 before discharge into the San Joaquin River, allowing for the
16 Port to sample the water and control the discharges into the San
17 Joaquin River, and to allow some pollutants to settle or
18 dissipate.  (Id. # 9-10, 12-20.)  Water from the detention pond is
19 discharged via a pipe to a pool.  (Id. # 15.)  Water in that pool
20 then flows through an outfall under the levee into the San
21 Joaquin River.  (Id.)

22          On February 24, 2005, plaintiff provided several

23 _____

24          [1]    Plaintiff notes that prior to the construction of the
   detention pond in 1998, storm water from the defendant's facility
25 entered the San Joaquin untreated in violation of the NPDES
   permit. (Pl.'s Statement of Disputed and Undisputed Facts # 12.)
26 Because this action is governed by a five-year statute of
   limitations, the truth of that assertion is irrelevant.  28
27 U.S.C. § 2462;  Chesapeake Bay Found. v. Bethlehem Steel Corp.,
   608 F. Supp. 440, 450 (D. Md. 1985).
28

1 federal and state agencies with "notice of Defendant's violations
2 of the Act, and of its intention to file suit against Defendant."
3 (Compl. ¶ 2); see also 33 U.S.C. § 1365(b)(1)(A) (requiring
4 plaintiffs to give 60 days notice to designated entities before
5 filing a citizen's suit under the act).  Plaintiff alleges that
6 none of the agencies authorized to litigate this matter elected
7 to do so.  (Id. ¶ 3.)  Accordingly, plaintiff filed this suit on
8 May 13, 2005, pursuant to the citizen's action provision of the
9 CWA.  33 U.S.C. § 1365.  Plaintiff brings four causes of action,
10 alleging violations of sections 301(a) and 402 of the CWA, 33
11 U.S.C. §§ 1311, 1342, and the conditions of defendant's NPDES
12 permit.  In the first claim, plaintiff alleges that defendant
13 discharged materials other than storm water.  In the second
14 claim, plaintiff alleges that defendant failed to develop and
15 implement an adequate SWPPP, BAT, and BCT.  In the third claim,
16 plaintiff alleges that defendant violated the terms of its permit
17 by failing to develop and implement an effective monitoring
18 program.  In the fourth and final claim, plaintiff alleges that
19 defendant discharged contaminated storm water.

20        On October 17, 2006, defendant filed a motion for
21 summary judgement, or in the alternative summary adjudication, on
22 plaintiff's first and forth causes of action.  Defendant argues
23 that plaintiff's complaint is insufficient because plaintiff has
24 failed to allege what the receiving water is in which defendant
25 supposedly made an unauthorized discharge and plaintiff has not
26 produced any evidence that defendant has caused any exceedances
27 of pollutants in the receiving water.  On November 1, 2006,
28 plaintiff filed a motion for partial summary judgment on the

1  second and third causes of action.  Plaintiff argues that it is

2  entitled to summary judgment on these claims as a matter of law

3  because defendant's shortcomings in its implementation of SWPPP,

4  BAT, BCT, and the monitoring program violate its NPDES Permit.

5  II.  <u>Discussion</u>

6           Summary judgment is proper "if the pleadings,

7  depositions, answers to interrogatories, and admissions on file,

8  together with the affidavits, if any, show that there is no

9  genuine issue as to any material fact and that the moving party

10 is entitled to judgment as a matter of law."  Fed. R. Civ. P.

11 56(c).  A material fact is one that could affect the outcome of

12 the suit, and a genuine issue is one that could permit a

13 reasonable jury to enter a verdict in the non-moving party's

14 favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

15 (1986).  The party moving for summary judgment bears the initial

16 burden of establishing the absence of a genuine issue of material

17 fact and can satisfy this burden by presenting evidence that

18 negates an essential element of the non-moving party's case.

19 <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

20 Alternatively, the movant can demonstrate that the non-moving

21 party cannot provide evidence to support an essential element

22 upon which it will bear the burden of proof at trial.  <u>Id.</u>

23          Once the moving party meets its initial burden, the

24 non-moving party must "go beyond the pleadings and by her own

25 affidavits, or by the 'depositions, answers to interrogatories,

26 and admissions on file,' designate 'specific facts showing that

27 there is a genuine issue for trial.'"  <u>Id.</u> at 324 (quoting Fed.

28 R. Civ. P. 56(e)).  The non-movant "may not rest upon . . . mere

1  allegations or denials of the adverse party's pleading . . . ."

2  Fed. R. Civ. P. 56(e); <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135,

3  1137 (9th Cir. 1989).  However, any inferences drawn from the

4  underlying facts must be viewed in a light most favorable to the

5  party opposing the motion.  <u>Matsushita Elec. Indus. Co., Ltd. v.</u>

6  <u>Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  Additionally, the

7  court must not engage in credibility determinations or weigh the

8  evidence, for these are jury functions.[2]  <u>Anderson</u>, 477 U.S. at

9  255.

10       The plaintiff movant "must establish beyond

11  peradventure <u>all</u> of the essential elements of the claim or

12  defense to warrant judgment in his favor."  <u>Fontenot v. Upjohn</u>

13  <u>Co.</u>, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original);

14  <u>see also</u> <u>Arnett v. Myers</u>, 281 F.3d 552, 561 (6th Cir. 2002) ("a

15  substantially higher hurdle must be surpassed, particularly where

16  . . . the moving party bears the ultimate burden of persuasion .

17  . . at trial").

18       A.   <u>Plaintiff's Standing</u>

19       Standing is "an essential and unchanging part" of the

20  Article III case-or-controversy requirement, and is a threshold

21

---

22       [2]   Defendant has moved, in the alternative, for summary
    adjudication.  While caselaw exists suggesting that a party may
23  move for summary adjudication of issues, <u>see, e.g.</u>, <u>Barker v.</u>
    <u>Norman</u>, 651 F.2d 1107, 1123 (5th Cir. 1981); <u>First</u> <u>Nat'l Ins. Co.</u>
24  <u>v. Fed. Deposit Ins. Corp.</u>, 977 F. Supp. 1051 (S.D. Cal. 1997),
    this is not the type of motion originally contemplated by Rule
25  56.  Moreover, motions for summary adjudication of issues request
    that the court resolve issues that dispose of neither a party nor
26  a claim, and seldom accomplish anything.  Importantly, defendants
    do not distinguish between their general request for summary
27  judgment and particular issues apt for summary adjudication.
    Therefore the court's following discussion applies to both
28  requests.

1  jurisdictional issue in every federal case.  Lujan v. Defenders
2  of Wildlife, 504 U.S. 555, 560 (1992); Warth v. Seldin, 422 U.S.
3  490, 498 (1975).  Consequently, to come into federal court,
4  litigants must establish "(1) an 'injury in fact' that is (2)
5  'fairly traceable' to the [defendant's actions] that he
6  challenges, and (3) that is 'likely [to be] redressed by a
7  favorable decision.'"  Jackson v. Cal. Dep't of Mental Health,
8  399 F.3d 1069, 1071 (9th Cir. 2005) (quoting Friends of the
9  Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81
10 (2000)).  An organization representing its members can meet the
11 first standing requirement if a member can aver specific facts
12 that show he or she has suffered an injury in fact.  Laidlaw, 528
13 U.S. at 181.

14        Defendant challenges plaintiff's ability to show an
15 injury in fact because plaintiff's affidavits from Messrs. Fries,
16 Holt, and Jennings demonstrate plaintiff would suffer an injury
17 for pollutants in the San Joaquin River, but not for pollutants
18 in the Port's drains, channels, and detention pond.  Defendant
19 proffers admissions by plaintiff that no members of CPSA use the
20 Port's detention pond or the ditches and pipes that take
21 defendant's storm water to that pond for recreational or any
22 other purpose.  (Morris Reply Decl. Ex. AA.)  The Supreme Court
23 has held that "environmental plaintiffs adequately allege injury
24 in fact when they aver that they use the affected area and are
25 persons 'for whom the aesthetic and recreational values of the
26 area will be lessened' by the challenged activity." Laidlaw, 528
27 U.S. at 181 (quoting Sierra Club v. Morton, 405 U.S. 727, 735
28 (1972)).  As water from the Port's detention pond is pumped into

1  the San Joaquin River, plaintiff demonstrates an injury by

2  averring that their use and enjoyment of the San Joaquin has been

3  curtailed because of defendant's activities.  <u>Natural Res. Def.</u>

4  <u>Council v. Sw. Marine, Inc.</u>, 236 F.3d 985, 994 (9th Cir. 2000).

5       To establish that the injury is fairly traceable to

6  defendant's activities, plaintiff need only show that defendant

7  "discharges a pollutant that causes or contributes to the kinds

8  of injuries alleged in the specific geographic area of concern."

9  <u>Id.</u>, 236 F.3d at 994.  There is no requirement to pinpoint the

10 "origins of particular molecules."  <u>Id.</u>  If defendant violated

11 the CWA, there is a sufficient relationship between plaintiff's

12 injury and defendant's activities.

13      Should the court find that defendant failed to comply

14 with the CWA, and impose civil penalties, it is well established

15 that would sufficiently redress the injuries of which plaintiff

16 complains.  <u>P.I.R.G. v. Powell Duffryn Terminals, Inc.</u>, 913 F.2d

17 64, 73 (3d Cir. 1990) ("The general public interest in clean

18 waterways will be served in this case by the deterrent effect of

19 an award of civil penalties.").

20      Defendant argues at length that plaintiff has failed to

21 conclusively establish standing with respect to the second and

22 third causes of action.  (Def.'s Opp'n 9-23.)  Defendant

23 specifically argues that even if standing is found for the first

24 and forth causes of action, standing does not automatically

25 extend to the second and third causes of action.  (Def.'s Opp'n

26 10 (citing <u>Parker v. Scrap Metal Processors, Inc.</u>, 386 F.3d 993

27 (11th Cir. 2004).)  In <u>Parker</u>, the Eleventh Circuit conducted

28 separate standing analyses for plaintiff's claims under the CWA

1    and the Resource Conservation and Recovery Act, 42 U.S.C. § 6901.

2    386 F.3d at 1002-04.   The court fails to see how this authority

3    supports the proposition that it must conduct separate standing

4    inquiries for all four causes of action when all four were

5    brought under the same statutory provisions, 33 U.S.C. §§ 1311,

6    1342.  See Natural Res. Def. Council v. Sw. Marine, Inc., 39 F.

7    Supp. 2d 1235, 1240 (S.D. Cal. 1999) ("If a plaintiff has Article

8    III standing to seek at least one remedy [under the CWA], that

9    plaintiff has standing to seek other available remedies even if a

10   court would conclude that that same plaintiff would not have

11   standing with respect to an additional remedy otherwise

12   insufficient.").   The court concludes that plaintiff has standing

13   to maintain this action.

14   B.   Defendant's Motion for Summary Judgment

15          Defendant moves for summary judgment on plaintiff's

16   first and fourth causes of action, or in the alternative summary

17   adjudication.   In the first cause of action, plaintiff alleges

18   that defendant discharged materials other than storm water in

19   violation of the CWA.   In the fourth cause of action, plaintiff

20   alleges that defendant discharged contaminated storm water.

21          The CWA makes it unlawful for any person or entity to

22   "discharge any pollutant" without an NPDES permit or in violation

23   of the provisions of an existing permit. 33 U.S.C. § 1311(a), §

24   1342(a). "Discharge of any pollutant" is defined as "any addition

25   of any pollutant to navigable waters from a point source." §

26   1362(12)(a).   The CWA defines "navigable waters" as "the waters

27   of the United States, including the territorial seas." § 1362(7).

28          The Agency has further defined "waters of the United

States" in its governing regulations at 40 C.F.R. 122.2.[3]

Specifically, "Waste treatment systems, including treatment ponds

or lagoons designed to meet the requirements of CWA (other than

cooling ponds as defined in 40 CFR 423.11(m) which also meet the

---

[3]     40 C.F.R. 122.2 Reads: <u>Waters of the United States</u> or
<u>waters of the U.S.</u> means:
(a) All waters which are currently used, were used in the past,
or may be susceptible to use in interstate or foreign commerce,
including all waters which are subject to the ebb and flow of the
tide;
(b) All interstate waters, including interstate "wetlands;"
(c) All other waters such as intrastate lakes, rivers, streams
(including intermittent streams), mudflats, sandflats,
"wetlands," sloughs, prairie potholes, wet meadows, playa lakes,
or natural ponds the use, degradation, or destruction of which
would affect or could affect interstate or foreign commerce
including any such waters:
        (1) Which are or could be used by interstate or foreign
travelers for recreational or other purposes;
        (2) From which fish or shellfish are or could be taken and
sold in interstate or foreign commerce; or
        (3) Which are used or could be used for industrial purposes
by industries in interstate commerce;
(d) All impoundments of waters otherwise defined as waters of the
United States under this definition;
(e) Tributaries of waters identified in paragraphs (a) through
(d) of this definition;
(f) The territorial sea; and
(g) "Wetlands" adjacent to waters (other than waters that are
themselves wetlands) identified in paragraphs (a) through (f) of
this definition.
<u>Waste treatment systems, including treatment ponds or lagoons</u>
<u>designed to meet the requirements of CWA (other than cooling</u>
<u>ponds as defined in 40 CFR 423.11(m) which also meet the criteria</u>
<u>of this definition) are not waters of the United States. This</u>
<u>exclusion applies only to manmade bodies of water which neither</u>
<u>were originally created in waters of the United States (such as</u>
<u>disposal area in wetlands) nor resulted from the impoundment of</u>
<u>waters of the United States. [See Note 1 of this section.] Waters</u>
<u>of the United States do not include prior converted cropland.</u>
<u>Notwithstanding the determination of an area's status as prior</u>
<u>converted cropland by any other federal agency, for the purposes</u>
<u>of the Clean Water Act, the final authority regarding Clean Water</u>
<u>Act jurisdiction remains with EPA.</u> (emphasis added).
        This definition is repeated in a nearly identical form
in the definition of "waters of the United States" governing the
Army Corps of Engineers. <u>See</u> 33 C.F.R. 328.3 (waste treatment
system exception is defined at 33 C.F.R. 328.3 (a)(8)).

1 criteria of this definition) are not waters of the United
2 States."  40 C.F.R. 122.2.

3       To qualify for the exclusion from the definition of
4 waters of the United states under 40 C.F.R. 122.2, a treatment
5 pond must be designed to meet the requirements of the CWA.
6 Courts have struggled to ascertain exactly what this means.  The
7 Second Circuit noted in United States v. TGR Corp., 171 F.3d 762,
8 765 (2d Cir. 1999), that the "regulations provide that this
9 'exclusion applies only to manmade bodies of water which neither
10 were originally created in waters of the United States (such as
11 disposal area in wetlands) nor resulted from the impoundment of
12 waters of the United States.'" (citing 40 C.F.R. 122.2).  The TGR
13 Corp. court held that a particular brook could not be considered
14 a "waste treatment system" because it was not a man-made storm
15 water system and was instead a "natural tributary of a navigable
16 water." Id. (affirming the district court's conclusion, which the
17 district court reached after a one-day bench trial).

18       However, the portion of the regulation to which the
19 Second Circuit cites was suspended by the EPA in 1980.  45 Fed.
20 Reg. 48620 (July 21, 1980) (suspending, "This exclusion applies
21 only to manmade bodies of water which neither were originally
22 created in waters of the United States (such as a disposal area
23 in wetlands) nor resulted from the impoundment of waters of the
24 United States.").  The Agency's purpose with that sentence "was
25 to ensure that dischargers did not escape treatment requirements
26 by impounding waters of the United States and claiming the
27 impoundment was a waste treatment system, or by discharging
28 wastes into wetlands." Id.  Industry petitioners argued that "the

1  language of the regulation would require them to obtain permits

2  for discharges into existing waste treatment systems, such as

3  power plant ash ponds, which had been in existence for many

4  years." Id.  The Agency also had "issued permits for discharges

5  from, not into, these systems." Id.  The current regulations

6  continue this suspension.  40 C.F.R. 122.2 n.1.

7       The United States District Court for the Northern

8  District of California found significance with the word

9  "designed" in the regulations.  N. Cal. River Watch v. City of

10  Healdsburg, No. 01-4686, at *33-34 (N.D. Cal. Jan. 23, 2004),

11  aff'd, 457 F.3d 1023 (9th Cir. 2006).  In Healdsburg, the City

12  argued that a pond, formed by an old gravel mining pit, acted as

13  percolating filter so that the city was entitled to the waste

14  treatment exception.  Id. at *34.  After a four-day bench trial,

15  the District Court held that the City was not entitled the

16  exception because the pond "itself was not 'designed' to meet the

17  requirements of the Clean Water Act or 'designed' to be part of

18  the waste-treatment system." Id.  Because the pond pre-existed

19  the CWA and pre-existed the city's treatment plant, the court

20  found that the pond was not "designed" with sewage disposal in

21  mind.  Id.

22       In affirming, the Ninth Circuit held that the "waste

23  treatment system exemption was intended to exempt either water

24  systems that do not discharge into waters of the United States or

25  waters that are incorporated in an NPDES permit as part of a

26  treatment system." Healdsburg, 457 F.3d at 1031-32 (citing 44

27  Fed. Reg. 32858 (June 7, 1979)); In the Matter of: Borden,

28  Inc./Colonial Sugars, 1984 1 E.A.D. 895 (E.P.A. 1984)).  The

13

1  Ninth Circuit held that while the pond may be part of a waste

2  treatment system, "it does not fall under the exemption because

3  it is neither a self-contained pond nor is it incorporated in an

4  NPDES permit as part of a treatment system." <u>Healdsburg</u>, 457

5  F.3d at 1032.

6       The Ninth Circuit counsels that "this exception was

7  meant to avoid requiring dischargers to meet effluent discharge

8  standards for discharges <u>into</u> their own closed system treatment

9  ponds." <u>Healdsburg</u>, 457 F.3d at 1032 (citing 45 Fed. Reg. 48620

10 (July 21, 1980)).  "Regulations under the CWA, however, still

11 extend to discharges <u>from</u> treatment ponds."  <u>Id.</u>  This court is

12 bound by the Ninth Circuit and concludes that the waste treatment

13 exemption would apply to waters that are incorporated into an

14 NPDES permit as part of a treatment system.  <u>Id.</u> at 1031-32.

15      The key question is whether the Port's detention pond

16 is a treatment system covered by a valid NPDES permit.  Defendant

17 bears the burden to prove that the exception applies to its

18 activities.  <u>Healdsburg</u>, 457 F.3d at 1031.  Defendant asserts

19 that the Port's detention pond constitutes a treatment system

20 covered by the Port's NPDES permit.  (Def.'s Mot. for Summ. J.

21 12.)  The Port's NPDES permit refers to the Port's detention pond

22 as the "East Complex retention basin." (Wall Decl. Ex. A ¶ 9.)

23 The detention pond discharges from a "point source" into the San

24 Joaquin River, a water of the United States.  (<u>Id.</u>)  The Port's

25 NPDES permit envisions "a cooperative partnership" between the

26 Port and defendant to control pollutants in storm water

27 discharges.  (<u>Id.</u> ¶ 24 (citing 58 Fed. Reg. 61157).)  The Port's

28 NPDES permit requires it to apply "best management practices that

1   reflect BAT/BCT to minimize or avoid [discharges of the specified

2   pollutants.]" (<u>Id.</u> § A.5.)

3          Plaintiff raises several doubts as to whether defendant

4   has met its burden.  Specifically, plaintiff argues that the Port

5   requires its tenants to abide by their own NPDES permits.  (Pl.'s

6   Opp'n 15-16.)  Evidence submitted by the plaintiff indicates that

7   the Port may not contemplate application of the Port's NPDES

8   permit to defendant's activities.  Specifically, a port official

9   testified that "the port requires their tenants to comply with

10  their NPDES permits." (<u>See</u> Lozeau Supp. Dec. Ex. C.)  Defendant

11  includes the Port's NPDES permit without explaining its

12  application to defendant.  (<u>See</u> Wall Decl. Ex. A.)  Defendant

13  does not point to any place in the Port's NPDES permit stating

14  that it covers defendant's activities.  Although this is a

15  question of law, "[c]ourts are entitled to assistance from

16  counsel, and an invitation to search without guidance is no more

17  useful than a litigant's request to a district court at the

18  summary judgment stage to paw through the assembled discovery

19  material." <u>Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.</u>,

20  309 F.3d 433, 436 (7th Cir. 2002) (citing <u>United States v.</u>

21  <u>Dunkel</u>, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like

22  pigs, hunting for truffles buried in" the record.)).

23  Accordingly, the court must deny defendant's motion for summary

24  judgment for failure to demonstrate that the Port's NPDES permit

25  applies to defendant.

26          Moreover, plaintiff raises doubts as to whether the

27  detention pond constitutes a best management practice ("BMP").

28  The Port's NPDES permit requires use of BMPs reflecting BAT/BCT.

15

1  (Wall Decl. Ex. A § A.5.)  BMPs are defined in the CWA.  33

2  U.S.C. § 1314(e); see also 40 C.F.R. 122.2.[4]  The CWA also gives

3  as guidance for BAT several factors, including "the age of

4  equipment and facilities involved, the process employed, the

5  engineering aspects of the application of various types of

6  control techniques, process changes, the cost of achieving such

7  effluent reduction, [and] non-water quality environmental

8  impact."  33 U.S.C. § 1314(b)(2)(B) (the factors for assessing

9  BCT are defined at 33 U.S.C. § 1314 (b)(4)(B) and are similar).

10  In order for the Port's detention pond to be a "waste treatment

11  system," it must comply with the CWA.  40 C.F.R. 122.2.  The CWA

12  prohibits discharge of any pollutant in violation of the

13  provisions of an existing NPDES permit.  33 U.S.C. § 1311(a), §

14  1342 (a).  The Port's NPDES permit requires the use of BMPs that

15  reflect BAT/BCT, and the Ninth Circuit has held that for the

16  waste treatment exemption to apply, there must be a treatment

17  system incorporated into an NPDES permit.  Healdsburg, 457 F.3d

18  at 1031-32.

19         Therefore, to be a waste treatment system as reflected

20  by the terms of the Port's NPDES permit and consequentially for

21  the waste treatment exemption to apply here, the Port's detention

22  pond must be a BMP reflecting BAT/BCT.  Defendant cites an Agency

23  publication indicating that a detention pond is an effective BMP.

24

25         [4]  BMPs are "schedules of activities, prohibitions of
   practices, maintenance procedures, and other management practices
26  to prevent or reduce the pollution of 'waters of the United
   States.'"  40 C.F.R. 122.2  "BMPs also include treatment
27  requirements, operating procedures, and practices to control
   plant site runoff, spillage or leaks, sludge or waste disposal,
28  or drainage from raw material storage."  Id.

1  (Wall Decl. Ex. E.)  Plaintiff's expert argues that through

2  evaporation, the detention pond may increase the concentration of

3  some pollutants.  (Lozeau Supp. Decl. Ex. D.)  Further, Thomas

4  Trexler, an expert for the defendant, argues that the grass and

5  weeds in the detention pond reduce oil and grease as those

6  materials would adhere to the grass and weeds.  (Lozeau Supp.

7  Decl. Ex. F.)  Plaintiff's expert offers photographic evidence

8  that the detention pond is almost completely unvegetated along

9  its sides.  (Bond Decl. Exs. F, G.)  Plaintiff's evidence raises

10  a disputed material fact as to whether the Port's detention pond

11  is a BMP reflecting BAT/BCT.  Since the court has concluded as

12  matter of law that Port's detention pond must meet that

13  requirement under the provisions of its NPDES permit for the

14  waste treatment exception to apply, the court must deny

15  defendant's motion for summary judgment as a disputed question of

16  material fact remains.

17        Lastly, the EPA's intent in promulgating the waste

18  treatment exemption was to prevent entities from claiming the

19  exemption by simply impounding "waters of the United States."  45

20  Fed. Reg. 48620.  Plaintiff argues that the Port's detention pond

21  is simply that, an impoundment of "waters of the United States."

22  (Pl.'s Opp'n at 25-26.)  Specifically, plaintiff argues that the

23  drains and channels that empty into the Port's detention pond are

24  themselves "waters of the United States."  The EPA's mandate and

25  logic would dictate that something does not lose its status as a

26  water of the United States by impoundment.  See W.Va. Coal Ass'n

27  v. Reilly, 782 F. Supp. 1276, 1289-90 (S.D.W.Va. 1989.) (instream

28  treatment ponds are method for treating pollutants resulting from

17

1  coal mining in which the flow of a natural stream is interrupted

2  to construct treatment ponds; since the pond interrupts a stream

3  it is a water of the United States); <u>Nat'l Wildlife Fed'n v.</u>

4  <u>Consumers Power Co.</u>, 862 F.2d 580, 589 (6th Cir. 1988) (power

5  company's "facility merely changes the movement, flow, or

6  circulation of navigable waters when it temporarily impounds

7  waters from Lake Michigan in a storage reservoir, but does not

8  alter their character as waters of the United States").

9       Plaintiff's argument depends on this court concluding

10 that the drains and channels flowing into the Port's detention

11 pond are "waters of the United States."  The storm water flowing

12 from defendant's facility to the Port's drains and channels would

13 not be considered "waters of the United States" if the Port's

14 detention pond is a treatment facility covered by a NPDES Permit.

15 <u>Healdsburg</u>, 457 F.3d at 1032 (dischargers need not meet effluent

16 discharge standards for discharges <u>into</u> their treatment ponds but

17 only <u>from</u> them).  The situation here is materially different from

18 an instream treatment pond or withdrawing water from a lake.  All

19 of the storm water on defendant's facility flows to the detention

20 pond prior to it being pumped into the San Joaquin River.  Those

21 waters never obtained the status of "waters of the United States"

22 if the waste treatment exemption applies, distinguishing the

23 cases mentioned above.  Although the court will deny defendant's

24 motion for summary judgment, the court does not deny the motion

25 on these grounds.

26     C.   <u>Plaintiff's Motion for Partial Summary Judgment</u>

27     The CWA imposes a duty on the NPDES holder to comply

28 with the terms of its Permit.  40 C.F.R. 122.41 ("The permittee

18

1  must comply with all conditions of this permit.  Any permit

2  noncompliance constitutes a violation of the Clean Water Act and

3  is grounds for enforcement action; for permit termination,

4  revocation and reissuance, or modification; or denial of a permit

5  renewal application.")  Plaintiff moves for summary judgment on

6  the second and third causes of action.  In the second cause of

7  action, plaintiff alleges that defendant failed to develop and

8  implement an adequate SWPPP, BAT, and BCT.  In the third cause of

9  action, plaintiff alleges that defendant violated the terms of

10 its permit by failing to develop and implement an effective

11 monitoring program.

12         As previously mentioned, several factors need to be

13 considered to assess BAT-compliance, including "the age of

14 equipment and facilities involved, the process employed, the

15 engineering aspects of the application of various types of

16 control techniques, process changes, the cost of achieving such

17 effluent reduction, [and] non-water quality environmental

18 impact."  33 U.S.C. § 1314(b)(2)(B).  Factors for BCT are

19 similar.  33 U.S.C. § 1314(b)(4)(B).  Assessing such factors is

20 often considered a question of fact.  Hudson Riverkeeper Fund v.

21 Orange & Rockland Utils., 835 F. Supp. 160, 165 (S.D.N.Y. 1993)

22 ("Best Technology Available, under the statute, is something

23 which exists, and can be ascertained as fact.")[5]  Specifically, in

24 this case, plaintiff argues that defendant did not comply with

25 BAT because it did not install certain measures on its own

26

27        [5]   Best Technology Available is governed by 33 U.S.C. §
   1314(b)(1)(B) and is largely similar to the criteria utilized for
28 BAT and BCT.

19

1  facility, such as sediment filters and hydrocarbon pads.
2  Plaintiff further argues that defendant's monitoring was
3  defective because it did not sample enough storm drains to
4  accurately represent the quantity and quality of storms water
5  discharging from the facility and did not test for pollutants
6  that it should reasonably have expected to be present in its
7  storm water discharges as required by the defendant's MRP.

8          Defendant presents a disputed material fact as to
9  whether the Port's detention pond complies with the BAT/BCT
10  requirement in defendant's NPDES permit, thus rendering summary
11  judgment inappropriate as to the second cause of action.
12  Defendant also presents evidence that (1) defendant's monitoring
13  of some, but not all, of its drains satisfies the
14  representativeness requirement of the permit in that the drains
15  tested adequately covered the land from which pollutants could
16  originate, and (2) defendant tested for the constituents
17  enumerated in its MRP, rendering summary judgment inappropriate
18  on the third cause of action.  Cf. Sierra Club v. El Paso Gold
19  Mines, 421 F.3d 1133, 1150 (10th Cir. 2005) (conflicting expert
20  testimony raises a genuine issue of material fact).  Therefore,
21  the court cannot grant plaintiff's motion for partial summary
22  judgment.

23          IT IS THEREFORE ORDERED that:

24          (1) defendant's motion for summary judgment, or in the
25  alternative summary adjudication, be, and the same hereby is,
26  DENIED; and
27  ///
28  ///

20

1          (2) plaintiff's motion for summary judgment on the

2    second and third causes of action be, and the same hereby is,

3    DENIED.

4    DATED: January 26, 2007

5

6    _____
     WILLIAM B. SHUBB

7    UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21